**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

JANE DOE, : 
                  Plaintiff, : 
: 
                v. :        Civil No. 5:20-cv-00377-JMG
: 
MORAVIAN COLLEGE, *et al.*, : 
                Defendants. : 

---

**MEMORANDUM OPINION**

**GALLAGHER, J.**                              **January 10, 2023**

## I.   OVERVIEW

Plaintiff Jane Doe alleges that she was sexually assaulted by defendants John Doe 1, John Doe 2 and John Doe 3 (collectively referred to as "the John Doe defendants") while she was a student at Moravian College on August 25, 2017. Plaintiff's Second Amended Complaint accuses defendant Moravian College ("Moravian") of Title IX violations, intentional infliction of emotional distress, and negligence. Plaintiff has also asserted claims against the John Doe defendants.[1] Before the Court is Moravian's Motion for Summary Judgment. For the reasons that follow, the motion is granted.

## II.   RELEVANT BACKGROUND AND ALLEGATIONS

In August 2017, Plaintiff was an incoming freshman student at Moravian College. Def. Moravian's Statement of Facts ¶ 3, ECF No. 101-2 [hereinafter "MCSOF"]; Pl.'s Resp. to Moravian's Statement of Facts ¶ 3, ECF No. 107-2 [hereinafter "PRSOF"]. Plaintiff, then 19

---

[1] On December 16, 2022, summary judgment was granted to defendants John Doe 1 and John Doe 2 with respect to Plaintiff's claim of intentional infliction of emotional distress, and denied with respect to Plaintiff's claim of assault and battery.

years old, was a member of the cheerleading team at Moravian College. MCSOF ¶¶ 3-4; PRSOF ¶¶ 3-4. Plaintiff moved into her campus dormitory approximately one week prior to the alleged incident so that she could participate in cheerleading tryouts and preseason practice. MCSOF ¶ 5; PRSOF ¶ 5. Plaintiff's dormitory was located at Wilhelm Hall, and she was assigned a roommate, M.B. MCSOF ¶ 6; PRSOF ¶ 6.

On Thursday, August 24, 2017, Plaintiff attended a dinner at a local restaurant following a cheerleading practice. MCSOF ¶ 7; PRSOF ¶ 7. Plaintiff returned to Wilhelm Hall at 6:08PM following the dinner. MCSOF ¶ 8; PRSOF ¶ 8. After she returned to her dormitory she went to the campus apartment of her teammate M.C., which was known as the "Cheerleading House." MCSOF ¶ 9; PRSOF ¶ 9. Plaintiff arrived at the Cheerleading House at approximately 7:14PM and stayed there for approximately two hours. MCSOF ¶ 10; PRSOF ¶ 10. Plaintiff consumed several alcoholic beverages while she was at the Cheerleading House. MCSOF ¶ 12; PRSOF ¶ 12. Plaintiff then walked her roommate M.B. back to their room at Wilhelm Hall. MCSOF ¶ 13; PRSOF ¶ 13. She entered the building at 9:17PM. *Id.* Plaintiff then returned to the Cheerleading House. MCSOF ¶ 14; PRSOF ¶ 14. After she arrived, Plaintiff and several other cheerleaders left the Cheerleading House and went to a house located at 127 W. Laurel Street, which was known as the "Football House." MCSOF ¶ 15; PRSOF ¶ 15.

When Plaintiff entered the Football House, she observed approximately 20 men in the living room listening to music and drinking. MCSOF ¶ 17; PRSOF ¶ 17. Plaintiff stayed at the Football House for approximately two hours. MCSOF ¶ 19; PRSOF ¶ 19. While she was there, she did not consume any alcohol, and instead drank bottled water, which was refilled several times by her cheerleading teammate K.O. *Id.* While at the party Plaintiff began dancing, but then started to feel hot and dizzy. MCSOF ¶ 20; PRSOF ¶ 20. She then sat down on a couch in

the living room.  *Id.*  A short time later, Plaintiff was approached by John Doe 3 and began

having a conversation with him.  MCSOF ¶ 21; PRSOF ¶ 21.  At the time John Doe 3 was a

student at Bloomsburg University and was visiting Moravian College that evening.  *Id.*

Members of the cheerleading team then began to leave the Football House, but Plaintiff

opted to stay behind with defendants John Doe 2 and John Doe 3.  Joint Appendix, ECF No. 102,

Ex. F., Jane Doe Dep. Vol. 2 Tr. 333: 3-17.  John Doe 2 was a sophomore at Moravian College

at the time.  Joint Appendix, ECF No. 102, Ex. H., John Doe 2 Dep. Tr. 9: 19-21.  Plaintiff then

left the house with John Doe 2 and John Doe 3. MCSOF ¶ 29; PRSOF ¶ 29.  At this time

Plaintiff believed that the two men were going to walk her back her dormitory.  *Id.*

Plaintiff has claimed that as they continued walking Plaintiff informed John Doe 2 and

John Doe 3 that she was feeling sick, and that John Doe 3 then offered to let her use the bathroom

in John Doe 1's dormitory.  MCSOF ¶ 34; PRSOF ¶ 34.  A short time later the group arrived at

John Doe 1's residence, which was located at the August Spangenberg Campus Townhouses

("Spang").  MCSOF ¶ 35; PRSOF ¶ 35.  They then waited approximately 10 minutes for John Doe

1 to arrive and let them into the residence.  MCSOF ¶ 39; PRSOF ¶ 39.

John Doe 1 then arrived and let Plaintiff, John Doe 2 and John Doe 3 into the building at

12:55AM on August 25, 2017.[2]  MCSOF ¶ 43; PRSOF ¶ 43; Joint Appendix, ECF No. 102, Ex.

E., Jane Doe Dep. Vol. 1 Tr. 145: 4-8.  Once Plaintiff and the John Doe Defendants entered the

residence they went upstairs and she was shown where the bathroom was located.  MCSOF ¶ 44;

---

[2] The parties have presented conflicting evidence regarding Plaintiff's first encounter with John
Doe 1.  In their Motion for Summary Judgment, Moravian alleged that Plaintiff kissed John Doe
1 twice when he arrived.  Additionally, in his interview with Detective Miller, John Doe 1 stated
that Plaintiff kissed him twice after he arrived to let them into the building.  Joint Appendix, ECF
No. 102, Ex. M at JA01454.  In her deposition, Plaintiff denied kissing any of the John Doe
defendants before going into John Doe 1's residence. Joint Appendix, ECF No. 102, Ex. E, Jane
Doe Dep. Vol. 1 Tr. 146: 13-21.

PRSOF ¶ 44.  After using the restroom, Plaintiff exited and walked into the upstairs hallway where she observed all three John Doe defendants inside a bedroom.  MCSOF ¶ 45-46; PRSOF ¶ 45-46. A sexual encounter between Plaintiff and the John Doe defendants then took place inside the bedroom.[3]  MCSOF ¶ 47-48; PRSOF ¶ 47-48.   A portion of the encounter was video recorded on a cellphone.  MCSOF ¶ 50; PRSOF ¶ 50.  John Doe 1 testified that he and John Doe 3 recorded videos on his phone, which he later shared with other individuals in a group message.  Joint Appendix, ECF No. 102, Ex. G., John Doe 1 Dep. Tr. 50-53.  Following the encounter, Plaintiff left the residence and was walked back to her dormitory by John Doe 3.[4]  MCSOF ¶ 51; PRSOF ¶ 51.  Plaintiff entered her dormitory at 1:59 a.m. on August 25, 2017.  MCSOF ¶ 55; PRSOF ¶ 55.

Later that morning Plaintiff spoke with her roommate M.B. and provided as much detail as she could recall regarding the events that had taken place earlier.  MCSOF ¶ 68; PRSOF ¶ 68. During this conversation Plaintiff was unsure if she consented to the sexual encounter.   MCSOF

---

[3] As previously addressed by the Court, the specific facts regarding the sexual encounter are in dispute.  *See* ECF No. 121.  Therefore, the Court declines to include these details in this memorandum.

[4] Another area of dispute is with respect to text messages that were allegedly sent by the parties on August 25, 2017.  In his deposition John Doe 3 stated that he received a text message from Plaintiff's cellphone at 2:23AM on August 25, 2017, which stated the following: "Make sure none of your friends talk.  I don't want this shit to deal with my freshman year.  So keep it to themselves.  I don't feel well either, so I think I may pass out soon but make sure they don't shit to anyone."  Joint Appendix, ECF No. 102, Ex. K., John Doe 3 Dep. Tr. 85: 7-18.  Plaintiff has denied sending the message and claims that the message cannot be authenticated at trial in part because the contents of the message do not appear in Plaintiff's cellphone nor were they recoverable when her phone was extracted.  PRSOF ¶ 57.

Plaintiff has alleged that defendants John Doe 1 and John Doe 2 exchanged messages in a group chat, which included the following: "We took her virginity"; "Y'all really violated that girl"; "She was calling us Daddy"; "She was fingering herself, I never saw a girl do that"; "She was crying in the bathroom"; "So, we may have a case"; and "Yea, cuz [John Doe 1] punched her." Joint Appendix, ECF No. 102, Ex. AA at JA2206-16.  Several of these messages appear to have been sent by defendant John Doe 2.  *See id.*  In an interview with Moravian College Title IX investigators, John Doe 1 challenged the veracity of the messages and stated that John Doe 2 was just "gassing" when he sent them.  Joint Appendix, ECF No. 102, Ex. S at JA 01710.

¶ 69; PRSOF ¶ 69.   This conversation was reported to a Moravian RA.   Later that morning, Plaintiff told her friend Brandon "something bad happened to be last night.  I think people took advantage of me last night."  MCSOF ¶ 71; PRSOF ¶ 71.  They then spoke to a Moravian RA who contacted the campus police.  *Id.*

### a.  Law Enforcement Investigation

Following the report of the alleged sexual assault, Plaintiff met with Detective Moses Miller of the Bethlehem Police Department.  MCSOF ¶ 72; PRSOF ¶ 72.  Plaintiff provided a handwritten statement containing details of the encounter.  Joint Appendix, ECF No. 102, Ex. M at JA01467.  On August 26, 2017, Detective Miller interviewed John Doe 1 about the incident. *Id.* at JA01454-55.  John Doe 1 also provided a written statement and the video of the sexual encounter to Detective Miller.  *Id.* at JA01455.  John Doe 2 was also interviewed by Detective Miller on August 26, 2017, and then provided a written statement on August 28, 2017.  *Id.*  On August 28, 2017, the cellphones belonging to Plaintiff, John Doe 1 and John Doe 2 were collected by the Bethlehem Police Department and sent to the Petzold Crime Lab for forensic testing.  *Id.* at JA01439.

In the course of his investigation, Detective Miller reviewed cellphone videos taken of the sexual encounter, written statements and text messages related to the encounter.  MCSOF ¶ 74; PRSOF ¶ 74; Joint Appendix, ECF No. 102, Ex. M at JA01464.  On August 29, 2017, Detective Miller met with Assistant District Attorney Tatum Wilson of the Northampton County District Attorney's Office to review video evidence, written statements and text messages regarding the sexual assault allegations.  Joint Appendix, ECF No. 102, Ex. M at JA01464. Upon review of this evidence, no criminal charges were filed against defendants John Doe 1, John Doe 2 or John Doe 3.  *Id.*

### b. **Title IX Investigation**

Following Plaintiff's report of the alleged sexual assault to police, Moravian initiated a Title IX investigation into the matter.  MCSOF ¶ 77; PRSOF ¶ 77.  Pursuant to this investigation, Moravian Title IX Coordinator Leah Naso (*nee* Breisch) issued "No Contact" orders to Plaintiff, John Doe 1 and John Doe 2 on August 26, 2017.  *Id.*  Two Title IX investigators were then appointed to gather evidence and question witnesses – Linda Hoy ("Hoy") and Donald Sabo ("Sabo").  MCSOF ¶ 78; PRSOF ¶ 78.  Both of these investigators had prior law enforcement experience and were employed by Moravian as Civil Rights Investigators assigned to conduct Title IX investigations.  MCSOF ¶ 79; PRSOF ¶ 79.  During the course of their investigation, Hoy and Sabo conducted several interviews of the Plaintiff and John Doe Defendants, along with 16 interviews of other witnesses.  MCSOF ¶ 80; PRSOF ¶ 80.  During this investigation, Plaintiff was interviewed on August 31, 2017, September 5, 2017 and September 25, 2017.  MCSOF ¶ 81; PRSOF ¶ 81.  John Doe 1 was interviewed on September 11, 2017, and September 25, 2017, and John Doe 2 was interviewed on September 15, 2017, and October 5, 2017.  Joint Appendix, ECF No. 102, Ex. S at JA01701.  Following the interviews with the witnesses, Hoy and Sabo prepared a written investigation report.  MCSOF ¶ 80; PRSOF ¶ 80.  Moravian College issued the investigation report on October 23, 2017.  *See* Joint Appendix, ECF No. 102, Ex. S at JA01693-01741.  Prior to issuing the final report, Plaintiff was given the opportunity to review her statement and make any revisions.  MCSOF ¶ 82; PRSOF ¶ 82.  Plaintiff made four revisions to her statement regarding the events that took place at the Football House and defendant John Doe 1's residence.  Joint Appendix, ECF No. 102, Ex. Q at JA01686-89.

A hearing in this matter before the Discipline and Review Committee at Moravian was scheduled for November 20, 2017.  Joint Appendix, ECF No. 102, Ex. R at JA01690-95.

Plaintiff was informed of the scheduled hearing and provided with a copy of the investigation report on November 6, 2017.  MCSOF ¶ 84; PRSOF ¶ 84.  Following her review of the report, Plaintiff met with Naso and discussed the hearing.  MCSOF ¶ 85; PRSOF ¶ 85.  During this meeting, Plaintiff was informed by Naso that John Doe 1 and John Doe 2 might not be expelled following the hearing.  *Id.*  Plaintiff then informed Naso that she no longer wished to proceed with the hearing and formal adjudication process.[5]  *Id.*  On November 10, 2017, Plaintiff was provided with written notice confirming her decision to no longer move forward with the disciplinary process.  MCSOF ¶ 86; PRSOF ¶ 86.  She was also informed that she retained the right to request that Moravian re-open the case and proceed with the hearing.  *Id.*  The No Contact Orders issued on August 26, 2017 continued to remain in effect.  *Id.*

### c.  Concerns Regarding No Contact Order

On several occasions, Plaintiff raised concerns with Naso regarding the No Contact Order and encounters with defendants John Doe 1 and John Doe 2 on campus.  MCSOF ¶ 88; PRSOF ¶ 88.  On September 19, 2017, Plaintiff emailed Naso and stated that she had seen defendants John Doe 1 and John Doe 2 in a campus dining hall, at which time Plaintiff observed them staring at her and whispering to the person they were with.  Joint Appendix, ECF No. 102, Ex. F., Jane Doe Dep. Vol. 2 Tr. 255-57.  In her email Plaintiff acknowledged that she would was going to see John Doe 1 and John Doe 2 from time to time on campus.  *Id.*  Naso responded to Plaintiff that same day and stated that while their conduct was likely not a violation of the No Contact Order, she would speak to John Doe 1 and John Doe 2 about the "need to be more mindful about how they may be impacting you during the course of this investigation."  *Id.* at 258-59.  Naso

---

[5] Plaintiff has testified that Naso informed her during this meeting that the hearing would be held in-person, and that Naso believed John Doe 1 and John Doe 2 would not be expelled.  Joint Appendix, ECF No. 102, Ex. E., Jane Doe Dep. Vol. 1 Tr. 227: 9-24.

then emailed John Doe 1 and John Doe 2 on September 20, 2017 and informed them of Plaintiff's concerns. MCSOF ¶ 90; PRSOF ¶ 90. While she acknowledged that their conduct was likely not a violation of the No Contact Order, Naso instructed John Doe 1 and John Doe 2 to be more mindful and look the other way if or when they encountered Plaintiff. *Id.* She also asked that they encourage their friends to do the same. *Id.*

On October 13, 2017, Naso emailed John Doe 2 regarding a complaint that John Doe 2 had made which involved Plaintiff allegedly telling other students on campus that John Doe 2 was a rapist. Joint Appendix, ECF No. 102, Ex. F., Jane Doe Dep. Vol. 2 Tr. at JA 00865. Naso acknowledged that Plaintiff's alleged conduct was not likely a violation of the No Contact Order, but that she would follow up with Plaintiff, remind her about the No Contact Order and ask that she be more mindful moving forward. *Id.* MCSOF ¶ 92; PRSOF ¶ 92. In her subsequent email to Plaintiff, Naso did not suggest that Plaintiff's alleged conduct violated the No Contact Order, but cautioned Plaintiff to be mindful of her actions as the disciplinary process progressed. Joint Appendix, ECF No. 102, Ex. F., Jane Doe Dep. Vol. 2 Tr. at JA00865.

On October 17, 2017, Plaintiff emailed Hoy and stated that she saw defendant John Doe 1 walk towards her from a distance of approximately 50 feet as she was walking back to her dormitory one evening. Joint Appendix, ECF No. 102, Ex. F. Jane Doe Dep. Vol. 2 Tr. at JA00867. Plaintiff stated that she changed her direction when she saw him approaching and thought that it was strange that she had to change her route but he did not. *See id.* Hoy then forwarded the email to Naso. *Id.* at JA00868. Naso emailed Plaintiff on October 19, 2017 and stated that she had contacted John Doe 1 to remind him of the terms of the No Contact Order and to ask him to be more mindful. *Id.* at JA00869.

On February 8, 2018, an incident between Plaintiff, Plaintiff's father and John Doe 1 took place at a Moravian basketball game. Joint Appendix, ECF No. 102, Ex. F., Jane Doe Dep. Vol. 2 Tr. 286-89. Plaintiff's parents attended the game to watch her cheer. *Id.* at 286: 8-25. Following the game, Plaintiff's father and John Doe 1 got into an altercation. *Id.* at 288. During this altercation, Plaintiff intervened and told John Doe 1 to leave.[6] *Id.* at 288: 6-19. Following the incident, Chief Conduct Officer Greg Meyer conducted an investigation into the matter, speaking with several witness to the incident. Joint Appendix, ECF No. 102, Ex. F. Jane Doe Dep. Vol. 2 Tr. at JA00886. Plaintiff was advised on February 22, 2018 that she was found to have violated the No Contact Order. MCSOF ¶ 94; PRSOF ¶ 94. Plaintiff was provided a letter detailing the findings, which included a deadline of March 1, 2018 to appeal the decision. Joint Appendix, ECF No. 102, Ex. F. Jane Doe Dep. Vol. 2 Tr. at JA00881. Plaintiff never appealed the decision. Joint Appendix, ECF No. 102, Ex. F., Jane Doe Dep. Vol. 2 Tr. 298: 24. John Doe 1 was found to be not responsible for violation of the No Contact Order. Joint Appendix, ECF No. 102, Ex. F. Jane Doe Dep. Vol. 2 Tr. at JA00886.

During the spring semester, Plaintiff applied to several other schools before deciding to transfer. Joint Appendix, ECF No. 102, Ex. F. Jane Doe Dep. Vol. 2 Tr. 300. In submitting her applications, Plaintiff had to provide an explanation of the violation to at least one prospective school. *Id.* at JA00884. Plaintiff attempted to have this violation removed from her disciplinary record, but was informed by Meyer she was no longer eligible to appeal the decision. Joint Appendix, ECF No. 102, Ex. F. Jane Doe Dep. Vol. 2 Tr. at JA00898. Meyer further informed

---

[6] Plaintiff claims that on February 8, 2018, her parents felt like they were being harassed by John Doe 1 and that John Doe 1 had acted aggressively towards her father. PRSOF ¶ 94. Plaintiff also claimed that she only intervened to stop a physical altercation from ensuing between her father and John Doe 1. *Id.*

Plaintiff that an expungement process would be implemented the following year, and that she would be eligible to apply to have her record expunged beginning in February 2019. *Id.*

Plaintiff remained a student at Moravian until the end of her freshman year. MCSOF ¶ 96; PRSOF ¶ 96. She continued as a member of the cheerleading team and participated in activities and events during the year. *Id.* During her two semesters at Moravian, Plaintiff posted a cumulative GPA of 3.76. MCSOF ¶ 97; PRSOF ¶ 97. At the conclusion of her freshman year, Plaintiff transferred to another school to complete her undergraduate education. MCSOF ¶ 100; PRSOF ¶ 100.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is properly granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are material if they "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute as to those facts is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248). "We view all the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Id.* (internal quotation marks and citation omitted).

The party moving for summary judgment must first "identify [] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial."

*Id.* at 324.  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

## IV.   DISCUSSION

Defendant Moravian moves for summary judgment with respect to Plaintiff's claims of (1) Moravian's alleged violation of Plaintiff's rights under Title IX; (2) intentional infliction of emotional distress; and (3) negligence.  With respect to Plaintiff's Title IX claim, Moravian contends that they are entitled to summary judgment because Plaintiff has failed to produce sufficient evidence to support her claim of Hostile Collegiate Environment, and, that the Supreme Court's recent decision in *Cummings v. Premier Rehab Keller, P.L.L.C.* precludes the damages that Plaintiff seeks.  Additionally, Moravian argues that Plaintiff has failed to produce sufficient evidence to support her claims of intentional infliction of emotional distress and negligence.  The Court addresses these arguments in turn.

### a.   Plaintiff's Title IX Claims

In her Second Amended Complaint, Plaintiff brought two Title IX claims against defendant Moravian: a "before" claim for the conduct that took place prior to and during the alleged assault, and an "after" claim with respect to defendant Moravian's actions following the alleged assault. In her response to Moravian's Motion for Summary Judgment, Plaintiff conceded she does not have a viable "before" claim against Moravian due to lack of evidence.  Therefore, summary judgment is granted to Moravian with respect to Plaintiff's "before" claim.  Plaintiff's Title IX claim now rests upon Moravian's actions following the alleged assault.

Count I of the Second Amended Complaint alleges a Hostile Collegiate Environment claim against Moravian under Title IX, wherein Plaintiff accuses Moravian of exhibiting deliberate indifference in their response to the alleged sexual assault.  Second Amended Complaint ¶¶ 56-65, ECF No. 49 ("Amended Complaint").  Plaintiff's accusations include, *inter alia*, that she was subjected to the continued presence of John Doe 1 and John Doe 2 on campus while the No Contact Order was in effect; the No Contact Order was not enforced against John Doe 1 and John Doe 2; Plaintiff was offered no remedies with respect to the dissemination of the videos of the alleged assault; and that Leah Naso, as a Moravian employee, did not act promptly in disciplining the alleged transgressions.  *Id.* at  ¶¶ 58-63.

In an action alleging a hostile collegiate environment based on student-on-student harassment under Title IX, a Plaintiff must show that:

> (1) the defendant received federal funds; (2) sexual harassment occurred; (3) the harassment occurred under circumstances wherein the funding recipient exercised substantial control over both the harasser and the context in which the harassment occurred; (4) the funding recipient had actual knowledge of the harassment; (5) the funding recipient was deliberately indifferent to the harassment; and (6) the harassment was so severe, pervasive, and objectively offensive that it [could] be said to have deprived the victim of access to the educational opportunities provided by the school.

*Davis*, 526 U.S. at 645-52.  In their Motion for Summary Judgment, Moravian contested items (5) and (6).

### i.      Deliberate Indifference

A showing of deliberate indifference requires a school response to student-on-student harassment that is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.  To prove deliberate indifference, a plaintiff must establish that the school made an official decision not to remedy the alleged violation.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S.

12

274, 290 (1989).  At a minimum, a plaintiff must show that the school's decisions "cause students to undergo harassment or make [them] liable or vulnerable to it."  *Davis*, 526 U.S. at 645; *see Doe v. Univ. of Scranton*, No. 19-CV-01486, 2020 WL 5993766, at *6 (M.D. Pa. Oct. 9, 2020).   In considering a case alleging student-on-student harassment, school administrators are to receive substantial deference with respect to their disciplinary process.  *Davis*, 526 U.S. at 648 ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators."); *see New Jersey v. T.L.O.*, 469 U.S. 325, 342-43, n.9 (1985)); *A.J. v. Mastery Charter High Sch.*, No. CV 19-1458, 2022 WL 4292330, at *4 (E.D. Pa. Sept. 15, 2022) ("It is not our place to second-guess Defendants' disciplinary decisions following their investigation."). These standards for deliberate indifference impose a significant burden on a Plaintiff and as such these claims "rarely proceed beyond a motion to dismiss."  *Saravanan v. Drexel Univ.*, 17-CV-3409, 2017 WL 5659821, at *7 (E.D. Pa. Nov. 24, 2017); *see T.B. v. New Kensington-Arnold Sch. Dist.*, 15-CV-0606, 2016 WL 6879569, at *7 (W.D. Pa. Nov. 22, 2016) ("the deliberate indifference standard sets a high bar for a plaintiff seeking to recover under Title IX").[7]

### ii.      Severe, Pervasive, and Objectively Offensive

To establish this element, a plaintiff must show that the alleged harassment was so "severe, pervasive, and objectively offensive that it [could] be said to have deprived the victim of access to the educational opportunities provided by the school."  *Davis*, 526 U.S. at 650.  In determining whether harassment is severe, pervasive, and objectively offensive, the following factors should be considered: "the frequency of the offensive conduct; the nature of the unwelcome sexual acts or words, for example, whether the harassment was physical, verbal or

---

[7] It should be noted that Plaintiff's Title IX claim survived a Motion to Dismiss in this case.  *See* ECF No. 46.

both; whether the harassment was merely an offensive utterance; and the relationship between the parties." *Chancellor v. Pottsgrove Sch. Dist.*, 529 F. Supp. 2d 571, 575 (E.D. Pa. 2008).  The Supreme Court has explained that "[w]hether gender-oriented conduct rises to the level of actionable 'harassment' thus depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved[.]" *Davis*, 526 U.S. at 651.

In this case Plaintiff has brought a Title IX claim alleging a hostile collegiate environment. In their Motion for Summary Judgment, Moravian argued that their response to Plaintiff's sexual assault allegations did not constitute deliberate indifference, and that Plaintiff has failed to produce sufficient evidence to show that she was subjected to harassment that was so "severe, pervasive, and objective offensive that it [could] be said to have deprived the victim of access to the educational opportunities provided by the school."  *Davis*, 526 U.S. at 650. In her response, Plaintiff has argued that she is entitled to relief under Title IX, in part due to Moravian's failure to take appropriate disciplinary action against John Doe 1 and John Doe 2 for the alleged sexual assault and dissemination of the videos taken of the alleged assault, Naso's alleged statements regarding the outcome of the disciplinary hearing, and Plaintiff's violation of the No Contact Order.  We need not address the question of whether a reasonable jury could return a verdict in Plaintiff's favor based on the evidence presented thus far, *see Physicians Healthsource, Inc.*, 954 F.3d at 618; *Daniels*, 776 F.3d at 192, because the damages that Plaintiff seeks with respect to her Title IX claim are barred following the recent Supreme Court decision *Cummings v. Premier Rehab Keller, P.L.L.C.* 142 S. Ct. 1562, reh'g denied, 142 S. Ct. 2853 (2022).

### iii.       Emotional Distress Damages

In their Motion for Summary Judgment, Moravian argues that the Supreme Court's recent decision in *Cummings* bars the recovery of non-economic damages in a private action brought under Title IX, including damages for emotional distress alleged by Plaintiff in this case.   In *Cummings*, a patient who was deaf and legally blind brought an action against her physical therapy provider under the Rehabilitation Act ("RA") and the Patient Protection and Affordable Care Act ("ACA"), wherein she alleged that her provider discriminated on the basis of her disability by failing to provide a sign language interpreter.  *Id.* at 1568-69.  Plaintiff sought damages for "humiliation, frustration, and emotional distress."  *Id.* at 1569.

In *Cummings* the Supreme Court discussed private remedies available under Spending Clause antidiscrimination legislation and acknowledged that while private individuals have the right to sue to enforce that that legislation, "it is less clear what remedies are available in such a suit." *Id.* at 1569-70 (quoting *Barnes v. Gorman*, 536 U.S. 181, 185 (2002).  The Supreme Court has repeatedly interpreted Spending Clause antidiscrimination legislation through a contract-law lens – "in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Cummings*, 142 S. Ct. at 1570 (quoting *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981)).  Applying this analogy, the *Barnes* Court held that in addition to the remedies explicitly enumerated in Spending Clause legislation, remedies "traditionally available in suits for breach of contract" would also be available.  536 U.S. at 187 (punitive damages not available because they are "generally not available for breach of contract").

In *Cummings*, the Court followed that same analogy and stated that in order to constitute "appropriate relief" in a private Spending Clause action, the funding recipient must be on notice that, "by accepting federal funding, it exposes itself to liability of that nature."  142 S. Ct. at 1570

(quoting *Barnes*, 536 U.S. at 187).  In addressing the availability of emotional distress damages, the Court asked the simple question:  "Would a prospective funding recipient, at the time it 'engaged in the process of deciding whether [to] accept' federal dollars, have been aware that it would face such liability?" *Id.* at 1570-71 (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006)).  If answered in the affirmative, then emotional distress damages are available; if no, they are not.  *Id.* at 1571.  Accordingly, the Court stated that "we may presume that a funding recipient is aware that, for breaching its Spending Clause 'contract' with the Federal Government, it will be subject to the usual contract remedies in private suits." *Id.* (citing *Barnes*, 536 U.S. at 187-88).  Following this logic and the Court's holding in *Barnes*, the Court held that federal funding recipients cannot be treated to have consented to be subject to damages for emotional distress as they are generally not available in an action for breach of contract, and therefore these damages are not recoverable under the Spending Clause statutes.  *Id.* at 1572.

In the wake of the Supreme Court's decision in *Cummings*, district courts have split on this issue, particularly on the availability of other damages remedies in a Title IX action where plaintiffs have sought emotional distress damages.  In *Montgomery v. D.C.*, plaintiff Montgomery was detained for over five years awaiting criminal trial before he was acquitted.  No. 18-CV-1928, 2022 WL 1618741, at *1 (D.D.C. May 23, 2022).  Montgomery had a history of mental health issues and alleged that he was experiencing "severe psychosis" at the time of the interrogation that led to his arrest.  *Id.* at *2.  His civil complaint alleged that defendant District of Columbia violated his rights under the Americans with Disability Act ("ADA") and the RA.  The Court denied defendant's Motion for Summary Judgment, concluding that while Plaintiff was not entitled to any emotional distress or reputation damages following the Supreme Court's decision in *Cummings*,

he was entitled to seek a small amount of damages to compensate him for lost opportunity due to being "denied the ability to meaningfully access and participate in his interrogations." *Id.* at *25. In *Chaitram v. Penn Med.-Princeton Med. Ctr.*, the Court found the plaintiff was eligible for compensatory damages under a loss of opportunity theory in an action alleging violations of the ACA and the RA.  No. 21-CV-17583, 2022 WL 16821692, at *2 (D.N.J. Nov. 8, 2022).  Plaintiff in that case sought damages for the "shame, anxiety, frustration, emotional distress, fear and discrimination" that defendant's actions caused her.  *Id.*  In addition to the emotional distress damages, Plaintiff had also requested injunctive and declaratory relief, compensatory damages, and any and all relief that may be appropriate.  *Id.*  Citing the reasoning of the *Montgomery* court, the Court found that the plaintiff had an expectation interest to engage and participate in her own medical care through effective communication, which she alleged that the defendant denied her, and was therefore eligible for compensatory damages.

In *Doe next friend of Doe v. City of Pawtucket*, the Court granted summary judgment to Defendants with respect to Plaintiffs' alleged damages for emotional distress and pain and suffering, nominal damages, and statutory damages.  2017-CV-00365, 2022 WL 4551953, at *3-5 (D.R.I. Sept. 29, 2022).  Following the *Cummings* decision, the District Court asked the same question addressed by the Supreme Court: "Would a prospective funding recipient ... have been aware that it would face such liability? If yes, then emotional distress damages are available; if no, they are not." *Id.* at *3 (quoting *Cummings*, 142 S. Ct. at 1570-71).  The Court answered this question in the negative, given the similarities between the statutes at issue in *Cummings*, the ACA and RA, and Title IX.  *Id.*  The Court found that pursuant to the Supreme Court's decision in *Cummings*, damages for emotional distress are unavailable in a private suit alleging violations of Title IX.  *Id.*

The Court also discussed the availability of other remedies following the *Cummings* decision, including nominal damages. Citing the RESTATEMENT (SECOND) OF CONTRACTS, the Court explained that nominal damages are available in a breach of contract action where damages that actually resulted from the breach cannot be proven or where no damages resulted from the breach. *Id.* at \*4; *see* RESTATEMENT (SECOND) OF CONTRACTS § 346(2) (Am. L. Inst. May 2022 Update); 24 WILLISTON ON CONTRACTS § 64.9 (4th ed. May 2022 Update). Plaintiffs in that case claimed that they were entitled to pursue nominal damages even though they had not requested them in their complaint. 2017-CV-00365, 2022 WL 4551953, at \*4. The Court did not address the timeliness of the request but found that plaintiffs had no claim for nominal damages. *Id.* Relying on the RESTATEMENT, the Court stated that nominal damages cannot be "a substitute for damages that might be proven but are otherwise unavailable." *Id.* As such, the Court ruled that plaintiffs could not substitute their emotional distress damages with nominal damages. *Id.* ("[To] the extent that Plaintiffs seek nominal damages for harm that is properly characterized as emotional distress, the Court rejects such a facial rebranding"); *see Hejmej v. Peconic Bay Med. Ctr.*, No. 17-CV-782 (JMA)(SIL), 2022 WL 5429675, 2022 U.S. Dist. LEXIS 119114, at \*25 (E.D.N.Y. July 5, 2022) (citations omitted) (internal quotation marks omitted) ("Plaintiffs cannot salvage their ... claim merely by recasting their request for relief [seeking emotional distress damages] as seeking nominal damages.").

We agree with the Court's reasoning in *City of Pawtucket* and conclude that Plaintiff's emotional distress damages under her Title IX claim are barred in this case. Title IX is one of the four Spending Clause statutes passed by Congress that prohibit discrimination based on protected characteristics. *Cummings*, 142 S. Ct. at 1569. While the case in *Cummings* involved claims under the RA and ACA, the Court held that these damages are not recoverable under the Spending Clause

statutes prohibiting discrimination, which includes Title IX.  *Id.* at 1572; *see Davis*, 526 U.S. at 629, 640 ("we have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause....") (citations omitted).  In her Second Amended Complaint, Plaintiff's Title IX claim sought damages only for emotional distress.  She did not seek any compensatory damages nor any injunctive relief.

In her response to Moravian's Motion for Summary Judgment, Plaintiff acknowledged that the Supreme Court's decision in *Cummings* bars recovery of emotional damages under Title IX. Plaintiff argued, however, that we should not follow that decision based on the retroactivity test set forth in *Chevron Oil Co. v. Huson.*  404 U.S. 97 (1971).  In response, Moravian contends that the modern rule for retroactivity is that a newly announced legal applies to all actions pending in the federal district courts or that are on appeal.  *See Atl. Coast Demolition & Recycling v. Bd. of Chosen Freeholders,* 112 F.3d 652, 672 (3d Cir.1997) (citing *Reynoldsville Casket Co. v. Hyde,* 514 U.S. 749, 751-53 (1995)).  We agree with Moravian.

In *Harper v. Virginia Dept. of Taxation*, the Supreme Court rejected the *Chevron* test for retroactivity.  509 U.S. 86, 97-98 (1993).  In that case the Court held that

> "[W]hen this Court does not 'reserve the question whether its holding should be applied to the parties before it,' however, an opinion announcing a rule of federal law 'is properly understood to have followed the normal rule of retroactive application' and must be 'read to hold ... that its rule should apply retroactively to the litigants then before the Court.'"

*Id.* (quoting *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 539 (1991) (opinion of SOUTER, J.)).  Since then the Third Circuit has embraced the modern rule for retroactivity cited by Moravian, wherein a newly announced federal legal rule applies to all open and non-final cases pending in the district courts or on appeal.  *See Atl. Coast Demolition & Recycling,* 112 F.3d at 672;  *M.S. v. Marple Newtown Sch. Dist.,* 635 F. App'x 69, 73 (3d Cir. 2015).  We find, that the

Supreme Court's decision in *Cummings* applies in this case, which in turn bars Plaintiff's damages for emotional distress. Therefore, summary judgment is granted to Moravian with respect to Plaintiff's Title IX claim.

### b.  Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress ("IIED") under Pennsylvania law, the plaintiff must allege facts that establish that (1) the defendant's conduct was "extreme and outrageous," (2) it was "intentional or reckless," (3) it caused emotional distress, and (4) the emotional distress was severe. *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir. 1979) (en banc); *see also Taylor v. Albert Einstein Med. Ctr.*, 754 A.2d 650, 652 (Pa. 2000) ("One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." (quoting RESTATEMENT (SECOND) OF TORTS § 46(1)). Conduct rises to the "extreme and outrageous" level if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (quoting *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. 1987)); *see also Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 991 (Pa. 1987) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d); *Field v. Philadelphia Elec. Co.*, 388 Pa. Super. 400, 428 (1989). Finally, in order to prevail on a claim of IIED in Pennsylvania, the plaintiff must prove that she "[suffered] some type of resulting physical harm due to the defendant's outrageous conduct." *Reedy v. Evanson*, 615 F.3d 197, 231 (3d Cir. 2010) (quoting *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005)). Moreover, any claim of emotional distress must be supported by competent medical evidence. *Kazatsky*, 515 Pa. at 197.

20

Plaintiff has alleged that Moravian's deliberate indifference following the alleged assault caused her emotional distress.  Second Amended Complaint ¶¶ 94-98, ECF No. 49.  These actions include Moravian's handling of the Title IX investigation and its failure to discipline John Doe 1 and John Doe 2, permitting John Doe 1 and John Doe 2 to remain on campus while the Title IX investigation was being conducted, the treatment she received from Ms. Naso and Mr. Meyer, and the finding that she violated the No Contact Order following the incident that took place at the Moravian basketball game on February 8, 2018.  *Id.* at ¶¶ 92-94; Pl. Resp. Mot. for Summ. J., ECF No. 107-1 at 14.  In their Motion for Summary Judgment, Moravian argues that the conduct alleged in this case cannot be considered "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  *Reedy*, 615 F. 3d at 231-32 (quoting *Field*, 565 A.2d at 1184).

We need not decide whether a jury could reasonably find that Moravian's conduct was "extreme and outrageous" because Plaintiff has failed to produce sufficient evidence to show that she suffered physical harm as a result of the alleged outrageous conduct.  Under Pennsylvania law, a Plaintiff must be able to show that she suffered some type of physical harm as a result of the defendant's outrageous conduct in an IIED case.  *See Reedy*, 615 F.3d at 231; *Hart v. O'Malley*, 436 Pa. Super. 151, 175 (1994), *aff'd*, 544 Pa. 315 (1996).   In *Reedy*, the Third Circuit affirmed summary judgment in favor of the defendants, two police officers and a township public safety director, where the plaintiff was unable to point to any physical harm she suffered as a result of the defendants' conduct.  In its opinion the Court stated

> While one may argue whether [Defendant's] conduct was "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious," *Field,* 565 A.2d at 1184, we need not decide the issue, because, to succeed on an intentional infliction of emotional distress claim, [Plaintiff] must show that she suffered "some type of resulting physical

> harm due to the defendant's outrageous conduct." *Swisher,* 868 A.2d at
> 1230.

*Reedy*, 615 F.3d at 231. Furthermore, a plaintiff alleging IIED is required to present competent

medical evidence regarding the physical harm suffered. *Kazatsky*, 515 Pa. at 197 ("We therefore

conclude that if section 46 of the Restatement is to be accepted in this Commonwealth, at the very

least, existence of the alleged emotional distress must be supported by competent medical

evidence.").

The Court takes very seriously the trauma and emotional distress claimed by Plaintiff,

however, the evidence in the record does not satisfy the physical harm requirement of an IIED

claim under Pennsylvania law. Moreover, Plaintiff has not presented any competent medical

evidence as is necessary to establish injuries that can be attributed to the alleged actions of

Moravian. Therefore, as a matter of law, because Plaintiff cannot establish that she experienced

physical harm as a result of Moravian's alleged actions, and has produced no competent medical

evidence, Moravian is entitled to summary judgment with respect to Plaintiff's IIED claim.

### c. Negligence

In Count IV of her second amended complaint, Plaintiff has asserted a claim of negligence

under Pennsylvania common law against Moravian alleging that the college failed to provide

adequate security. Second Amended Complaint ¶¶ 101-111, ECF No. 49. To establish a claim of

negligence under Pennsylvania law, a plaintiff must show that "(1) the defendant owed the plaintiff

a duty of care, (2) that duty was breached, (3) the breach resulted in the plaintiff's injuries, and (4)

the plaintiff suffered an actual loss or damages." *Collins v. Phila. Suburban Development Corp.*,

179 A.3d 69, 73 (Pa. Super. 2018) (quoting *Merlini ex rel. Merlini v. Gallitzin Water Authority*,

980 A.2d 502, 506 (Pa. 2009)). A landlord generally owes no duty to protect its tenants from the

criminal conduct of other parties. *Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984). However, an

exception to this rule is recognized where the landlord establishes a program of security, the tenants reasonably rely upon it, and the landlord negligently carries out the program.  *Id.*  Importantly, though, "a tenant may not expect more than is offered."  *Id.*

Here, Plaintiff has offered scant evidence regarding the security program or protocol implemented by Moravian in the dormitories at the school.  To date, evidence has been produced that shows the defendant Moravian required school identification cards to enter the dormitories, they used residential advisors in their dormitories, and that security workers were employed by the school.  Taken as a whole, there is evidence that Moravian had in fact implemented security protocols in the campus dormitories at the time of the alleged assault, and their students, in this case the Plaintiff, reasonably relied on these protocols.  As such, Moravian owed a duty to the Plaintiff as a landlord.

Moravian contends that no such duty is owed because courts have moved away from imposing a duty of *in loco parentis* upon colleges and universities.  *See Bradshaw v. Rawlings*, 612 F.2d 135, 138 (3d Cir. 1979); *Alumni Ass'n v. Sullivan*, 524 Pa. 356, 364 (1990); *Millard v. Osborne*, 416 Pa. Super. 475, 487 (1992).  While the authoritarian role of colleges and universities has been diluted over time, *see Bradshaw*, 612 F.2d at 138, the alleged assault in this case occurred in a campus dormitory.  There is evidence that this dormitory, like other dormitories on campus, had a security program in place that was designed to protect students.  There is also evidence that Plaintiff reasonably relied on that program of security.  Additionally, none of the cases cited above involved tortious acts alleged to have taken place in campus dormitories.  *See Bradshaw*, 612 F.2d at 138 (student passenger injured in off campus automobile accident);  *Sullivan*, 524 Pa. at 358 (owner of off-campus fraternity house sued students after fire damaged house); *Millard*, 416 Pa. Super. at 477 (student motorcyclist killed in off-campus motorcycle accident).

23

Now that we have concluded that Moravian owed the Plaintiff a duty as a landlord, we must now address the second element of Plaintiff's negligence claim: whether Moravian breached that duty.  To determine whether a defendant has breached their duty in a landlord tenant context, a Plaintiff must go beyond a "showing that what was provided could have been better administered or undertaken in a more effective manner."  *James v. Duquesne Univ.*, 936 F. Supp.2d 618, 643 (W.D. Pa. 2013).  A plaintiff must allege that the operation of the security program was negligent.

In *James*, a student at Duquesne University was shot after leaving a dance that was held on campus by a campus organization.  *Id.* at 623-24.  The student then commenced a personal injury action against the university, alleging, *inter alia*, that the university was negligent in providing security for its students.  *Id.* at 628.  Plaintiff's expert in that case identified several areas where the security protocol had failed at the time of the incident, including, failing to provide off-duty officers at the entrance, delegating students the responsibility of providing security, failing to instruct off-duty officers about their duties and responsibilities at the dance, and failing to assign a uniformed security officer at the entrance to the dance.  *Id.* at 643.  In granting summary judgment to the defendant, the Court stated that the expert's findings did not establish breach of a cognizable duty because it was not "based on an expectation of the reasonable benefits of what was offered." *Id.* at 644.  Referencing the Pennsylvania Supreme Court's decision in *Feld*, the Court held that Plaintiff's theory that the security measures were inadequate and could have been better administered did not establish a breach of duty under Pennsylvania law.  *Id.* ("*Feld* and its progeny consistently hold that such a showing does not breach a duty…").

Here, Plaintiff has failed to establish that Moravian breached its duty to provide an adequate program of security to its students.  First, outside the use of campus scan cards, the presence of campus security officers and the use of residential advisors, Plaintiff has failed to

establish what the security program at Moravian specifically entailed during the time period of the alleged assault.  Moreover, Plaintiff has failed to produce any evidence to establish what the standard campus security practices were at that time, particularly with respect to campus dormitories.  Plaintiff's evidence includes the use records of scan cards to enter campus buildings, testimony regarding the presence of campus security officers and the use of residential advisors, and an affidavit from a residential advisor.  This evidence is insufficient to support Plaintiff's claim of negligence.

In her motion response, Plaintiff appears to claim that there is a material dispute of fact because a large majority of campus sexual assaults take place during the first weeks of semesters, according to publicly available statistics.  This claim goes to foreseeability, insofar as Moravian was on notice regarding the prevalence of campus sexual assaults during that time period, and as such should have had better security in place.  However, even if we were to find an issue of fact with respect to the foreseeability of the alleged assault, Plaintiff still has not produced sufficient evidence to suggest that Moravian's security program, particularly with respect to campus dormitories, was operated negligently on the night of the assault.  Therefore, we grant summary judgment to Moravian with respect to Plaintiff's negligence claim.

## V.  CONCLUSION

For the reasons set out in this memorandum, summary judgment is granted to Moravian. An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge

25